UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| EXPANSION CAPITAL GROUP, LLC, | 4:18-CV-04135-RAL |
| Plaintiff, | |
| vs. | OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |
| MATT PATTERSON, | |
| Defendant. | |

Plaintiff Expansion Capital Group, LLC (ECG) sued Defendant Matt Patterson (Patterson) for breach of fiduciary duty, breach of contract or implied contract, and tortious interference with business relationship. Doc. 1. Patterson filed a motion for summary judgment or, in the alternative, partial summary judgment, Doc. 101, which ECG opposes. ECG filed its own motion for partial summary judgment, Doc. 128, which Patterson opposes. For the reasons explained herein, this Court grants only limited portions of the cross motions for summary judgment.

## I.  Material Facts

Cross motions for summary judgment present a court with a challenge in summarizing the material facts. This Court is obliged to view the facts most favorably to ECG when ruling on Patterson's motion for summary judgment, but to view the facts in the light most favorable to Patterson when ruling on ECG's partial motion for summary judgment. This Court draws the material facts principally from those portions of the statement of undisputed material facts filed by the parties, Docs. 103, 130, to which the opposing party does not object in the responses, Docs.

1

113, 144, supplemented by documents in the record to which there can be no genuine dispute of material fact. This Court of course is making no factual findings. Where the parties have substantially different views of the facts, this Court summarizes those differences.

### A. Factual Overview

ECG is a Delaware limited liability company. Doc. 144 at ¶ 1. ECG's principal place of business throughout its existence has been in Sioux Falls, South Dakota. Patterson and Jay Larson founded ECG in 2013. Doc. 144 at ¶ 4. Patterson invested $100,000 in ECG and earned "sweat equity"[1] in ECG through his work as its chief executive officer (CEO). Doc. 104 at ¶¶ 3–4. Patterson is a citizen and resident of Idaho. Doc. 1 at ¶ 22; Doc. 11 at ¶ 1. This Court has diversity jurisdiction over the case under 28 U.S.C. § 1332. Doc. 1 at ¶ 23; Doc. 11 at ¶ 5.

ECG provides small business financing through business loans, merchant cash advances, and factoring-type agreements. Doc. 144 at ¶ 2. The original two members of ECG were Jay Larson personally and Kirkcaldy Group, LLC (Kirkcaldy). Doc. 144 at ¶ 6. Kirkcaldy ostensibly is a manager-managed LLC with Somphone Soukhaseum as its manager, but Patterson effectively controls Kirkcaldy.[2] Doc. 144 at ¶ 7. Although Larson originally held his interest in ECG individually, he transferred it to a single-member LLC called Grass Creek Investments, LLC (Grass Creek), in which he was the manager and sole member. Doc. 144 at ¶ 8. Patterson served as the CEO of ECG, while Larson served as the chief operating officer of ECG.

Seco Ventures, Ltd., (Seco) invested $1 million in ECG in exchange for which ECG issued Seco a convertible promissory note dated December 31, 2013. Doc. 144 at ¶ 9. Vincent Ney (Ney)

---

[1] This information is taken directly from Patterson's affidavit. Other information in the record suggests that Patterson's entity Kirkcaldy Group, LLC may have made the financial investment and earned equity based on Patterson's work.

[2] Additional facts concerning the relationship among Kirkcaldy, Patterson, and ECG are included in the discussion of whether Patterson was an employee of ECG.

is the manager of Seco.  Doc. 144 at ¶ 10.  At the time of Seco's investment in ECG in 2013, Patterson and Larson had little prior experience in merchant cash advances for commercial lending.  Doc. 144 at ¶ 23.

On March 31, 2014, American Dream, LLC (American Dream) purchased membership units in ECG.  Doc. 144 at ¶ 11.  James Frauenberg, Jr. is the manager of American Dream.  Doc. 144 at ¶ 12.

At least since December of 2014, with the signing of the Second Amended Operating Agreement, ECG has been governed by a board of managers.  Doc. 1-4[3]; Doc. 144 at ¶¶ 13–14. Patterson's interest in ECG was represented on the Board by his company Kirkcaldy.  Doc. 104 at ¶ 5.  Although Patterson's friend Soukhaseum was Kirkcaldy's designee to the Board, in practice Patterson participated in the Board meetings for Kirkcaldy.  Doc. 104 at ¶ 6.  The Second Amended Operating Agreement delineated that the board consisted of one representative of Kirkcaldy, one representative of Grass Creek, one representative of American Dream, and two representatives of Seco (in its capacity at that time as the holder of debt with the right to convert that debt to equity). Doc. 144 at ¶ 14; Doc. 1-4 at ¶ 4.01(a).

Effective October 30, 2015, with the signing of the Third Amended Operating Agreement, ECG and Seco agreed to convert Seco's debt to equity, and Seco became the fourth member of ECG.  Doc. 144 at ¶ 15; Doc. 1-5 at 2, 21.  Kirkcaldy (the entity controlled by Patterson) executed the Second Amended Operating Agreement and the Third Amended Operating Agreement, but Kirkcaldy did not sign the Fourth Amended Operating Agreement or the Fifth Amended Operating Agreement.  Doc. 1-6; Doc. 114-7.  Accordingly, and because most of the dispute centers on events

---

[3] Several documents, like the Second Amended Operating Agreement for instance, are in the CM/ECF record in multiple places. This Court cites to where such documents first appear in the record, rather than to each location where the same document is found in CM/ECF.

3

during the time of the Third Amended Operating Agreement, this Court refers to the Third

Amended Operating Agreement for the material terms governing the relationships.

ECG was a financial success. According to Patterson's affidavit, ECG went from two

employees to 70 in less than three years and went from no revenue to $15 million in revenue within

two to three years. Doc. 104 at ¶ 30.

Under Section 4.01(c) of the Third Amended and Restated Operating Agreement:

The Board shall have the sole and exclusive authority for control, management,
direction, and operation of the Company's affairs and exclusive powers to bind the
Company with any legally binding agreement, including . . . to incur debt, transfer
assets or engage in other transactions.

Doc. 1-5 at § 4.01(c); Doc. 144 at ¶ 19. Section 4.01(d) of the Third Amended and Restated

Operating Agreement requires unanimous approval for, among other action:

(i) incurring debt in a single transaction or a series of related transactions of more
than $100,000; . . . (v) any capital expenditures in excess of $50,000; (vi) entering
into a contract or other agreement that obligates the Company to spend, transfer or
convey assets of more than $50,000 . . . .

Doc. 1-5 at § 4.01(d); Doc. 144 at ¶ 20. Under that same Section 4.01(d) of the Third Amended

and Restated Operating Agreement, any such Board approval must "be taken at a meeting or via

written or electronic correspondence." Doc. 1-5 at ¶ 4.01(d); Doc. 144 at ¶ 21.

### B. Facts Relating to Count I

ECG in Count I of its complaint claims that Patterson as CEO of ECG breached fiduciary

duties owed to ECG by: (a) overpaying an ECG investor named Dan Pham approximately

$123,933; (b) failing to collect approximately $265,000 in management fees owed to ECG by

entities owned by Justin and Jason Abernathy; (c) forming a participation fund to compete against

ECG; (d) misusing confidential information of ECG to benefit his other companies; and (e) using

his position of trust and confidence with ECG to further his own private interest and harm ECG.

Doc. 1 at ¶¶ 95–99. Patterson seeks summary judgment on this claim in its entirety. ECG's motion for partial summary judgment seeks summary judgment on the claims relating to the Pham and Abernathy dealings, as well as claims related to expenditures exceeding $50,000 not approved by the Board. The parties have very different views on the Pham and Abernathy dealings and the expenditures exceeding $50,000.

### 1.    Dealings with Dan Pham

Patterson, as CEO of ECG, negotiated a loan participation agreement with an entity owned by Dan Pham in 2015. Doc. 144 at ¶ 69. Under this agreement, Pham acquired a stake in loans ECG extended to certain borrowers and was to receive a share of the principal and fees those borrowers agreed to pay to ECG, in exchange for Pham's monetary participation in the loans. Doc. 144 at ¶ 70. Patterson claims that he received the requisite votes from Board members to support the Pham participation agreement, but ECG contests that. Doc. 144 at ¶ 71; Doc. 132 at ¶¶ 8–9.

In December of 2015, Patterson caused ECG to wire Pham approximately $123,993 after ECG terminated the participation agreement with Pham. Doc. 144 at ¶¶ 73, 74. Patterson asserts that ECG agreed to pay Pham under three Termination of Participation Agreements dated November 22, 2015. Doc. 104 at ¶ 19; Doc. 104-10; Doc. 104-11; Doc. 104-12; Doc. 144 at ¶ 75. ECG claims that $123,993 was not due and owing to Pham under the participation agreement with ECG, and that regardless Patterson did not receive Board approval to terminate the participation agreement or make that $123,993 payment. Doc. 144 at ¶¶ 75–76; Doc. 132 at ¶¶ 12–15. Patterson counters that he received the approval of Ney (beneficial owner of Seco and in control of two positions on the ECG Board)[4] before terminating the participation agreement with Pham and

---

[4] The record is far less than clear that Ney approved the Pham transactions. Patterson cites to the deposition of Jay Larson where Larson states that he assumed Patterson obtained Ney's approval because Patterson always obtained Ney's approval early on. Otherwise, Patterson claims only that

making payment to Pham. Doc. 105-26 at 8–9; Doc. 144 at ¶ 76. Patterson explains that, as written, the participation agreement with Pham precluded Pham from making a positive return on his investment. Doc. 113 at ¶ 9. Thus, to preserve ECG's business relationship with Pham and encourage Pham to loan money to ECG in the future, Patterson had ECG pay Pham a greater return than what was required under the participation agreement. Doc. 113 at ¶ 11. Larson, the CEO of ECG at the time, backs up Patterson's assertion. Doc. 113 at ¶ 9. However, ECG believes that Pham's participation agreement would have yielded him a net profit, and even if the amount of the return was an issue with Pham, that did not merit ECG paying him monies not owed under the participation agreement. Doc. 113 at ¶¶ 9–11.

In 2016, Pham loaned ECG $1.5 million and "repurchased" his participations, which Pham testified that he would not have done if the preexisting participation agreements remained in place. Doc. 104 at ¶ 19; Doc. 105-27 at 10. Pham apparently did not realize that he was paid more with the termination of those preexisting participation agreements than he would have been entitled to under the participation agreements themselves. Doc. 105-27 at 7–9; Doc. 113 at ¶ 15.

## 2. Dealings with the Abernathys

Brothers Justin and Jason Abernathy, through their entities SIA Unite, LLC and SureFunding, LLC (collectively Abernathy entities), also had participation agreements with ECG. Doc. 104-13; Doc. 104-14; Doc. 113 at ¶ 16. These participation agreements with the Abernathy

---

he and Larson agreed to pay Pham $123,993. Doc. 103 at ¶ 11; Doc. 104 at ¶ 18. In his reply memorandum in support of his motion for summary judgment, Patterson states in regard to the Pham transaction that, "Patterson denies that he failed to obtain Board approval for any action requiring it, but to avoid a contested issue of material fact he will concede the point here." Doc. 124 at 4. Yet in response to ECG's motion for summary judgment, Patterson claims he obtained the requisite approval. Doc. 144 at ¶ 76. Both the Second and Third Operating Agreements require such approval to be through a meeting or written or electronic correspondence, and the CM/ECF record is devoid of any such approval.

entities were in effect from March of 2015 to November of 2016. Doc. 113 at ¶ 18. Under the participation agreements, the Abernathy entities were to pay ECG a three percent management fee unless a certain marketing campaign associated with the Abernathy entities resulted in ECG making at least $500,000 in future advances or receivable purchases. Doc. 104-13 at ¶ 2.3, Addendum A; Doc. 104-14 at ¶¶ 2.3, Addendum A; Doc. 113 at ¶ 17; Doc. 144 at ¶¶ 79–80. ECG contends that, notwithstanding the Abernathy entities failing to refer such future business, Patterson agreed to have ECG waive the three percent management fee without obtaining the requisite Board approval. Doc. 1 at ¶ 69; Doc. 144 at ¶¶ 80–81. Patterson counters that he was not the ECG employee responsible for collecting the management fee, that he was not even aware that ECG failed to collect the management fee, and that, after his departure from ECG, ECG chose to negotiate a settlement of various disputes with the Abernathy entities instead of seeking to collect the management fee. Doc. 104 at ¶¶ 21–24.

### 3.    Other Transactions Exceeding $50,000

ECG points to, and seeks partial summary judgment on, various other transactions where Patterson allegedly failed to get Board approval for ECG expenditures exceeding $50,000. Those additional expenditures allegedly include: (a) a commitment for ECG to spend $104,479 on Minnesota Vikings season tickets; (b) a $60,000 agreement to pay for executive coaching for Patterson and Larson through an entity called Vistage; (c) a commitment to spend $120,000 with Metric Theory for marketing; and (d) an unauthorized $60,000 call center contract. Doc. 144 at ¶ 82. Patterson counters that it was Larson who purchased the Vikings tickets on behalf of ECG without Patterson's knowledge; that the executive coaching cost was less than $50,000 and was necessary to benefit ECG; that the marketing expense through Metric Theory was less than $50,000 and was critical to ECG's success; and that it was Larson who entered into the call center

contract and that such a phone system was essential to maintaining a call center.  Doc. 104 at ¶¶ 27–30; Doc. 144 at ¶ 82.  ECG replies that Patterson was CEO at the time, received reports concerning these expenditures and thus was fully aware of them, and still did not obtain Board approval.  Doc. 113 at ¶¶ 38–42.  Some of the other claims of breach of fiduciary duty overlap allegations underlying Count II of the complaint regarding Patterson's activities around or after the time he left being CEO of ECG and whether he breached a noncompete agreement.

### C. Facts Relating to Count II

Count II of the complaint alleges "Breach of Contract/Implied Contract," contending that Patterson was bound by restrictive covenants in the various operating agreements and breached those by ultimately competing with ECG.  Doc. 1 at ¶¶ 101–111.  The various amended operating agreements contain a restrictive covenant.  The Third Amended Operating Agreement, the last one signed by Kirkcaldy (the entity controlled by Patterson) provided that a "Restricted Member" and their "Affiliates" are prevented from competing with ECG for a one-year period from "his or its Separation Date."  Doc. 144 at ¶ 26; Doc. 1-5 at § 5.04(a).  In turn, "Restricted Member" includes "Kirkcaldy Group, LLC," and any "Affiliate."  Doc. 1-5 at §§ 2.04(c)(ii), 5.04(a).  "Affiliate" is defined as:

> including, without limitation, as officer, director, manager, member, employee or agent of an entity engaged in a Restricted Business or of or through any person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with the Restricted Member.

Doc. 144 at ¶ 27; Doc. 1-5 at § 5.04(a).  During oral argument in this case, Patterson's attorney acknowledged that Patterson is within the compass of this restriction.

The Third Amended Operating Agreement defined "Separation Date" to be the "termination of the Service Relationship with the Company of . . . Kirkcaldy Group, LLC."  Doc. 144 at ¶ 28; Doc. 1-5 at § 2.04(c)(iii).  The Third Amended Operating Agreement defines "Service

Relationship" as "in the case of Kirkcaldy Group, LLC, its service to the Company in the office of Executive Manager, including service in that office exercised through its agent by delegated authority." Doc. 144 at ¶ 29; Doc. 1-5 at § 2.04(c)(iv). The "delegated authority" language dovetails with § 4.01(f), which allowed Kirkcaldy to "delegate its authority and powers to an appointed agent . . . ." See Doc. 1-5 at § 4.01(f). Patterson was that delegated agent given his role as CEO and his participation in Board meetings, notwithstanding that Soukhaseum on paper was Kirkcaldy's representative to the Board. Doc. 144 at ¶ 31.

The heart of the noncompete provision is in § 5.04(a) of the Third Amended Operating Agreement, which states that a "Restricted Member" shall not:

> directly or indirectly engage in the business of merchant receivables purchases, merchant cash advances or merchant lending (each a "Restricted Business") . . . own, manage, operate, control or otherwise engage or participate in, or be connected as an owner, partner, principal, creditor, salesman, guarantor, advisor, member of the board of directors of, member of the board of managers of, employee of or consultant in, any entity or business, or any division, group or other subset of any business, engaged in a Restricted Business.

Doc. 144 at ¶ 32; Doc. 1-5 at § 5.04(a). Section 5.04(a) then expansively lists the entities and individuals prevented from engaging in a Restricted Business by reference to the definition of Affiliate, which includes through any person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with the Restricted Member. Doc. 144 at ¶ 33; Doc. 1-5 at § 5.04(a). The Third Amended Operating Agreement also required each Restricted Member to:

> . . . obtain from each officer, employee, manager and beneficial owner of a membership interest…a written agreement binding such person or entity from engaging in any act or activity prohibited to the Restricted Member under this Section 5.04 . . . .

Doc. 144 at ¶ 34; Doc. 1-5 at § 5.04(c). Although Kirkcaldy did not obtain such a written agreement from Patterson, Patterson does not dispute that he is covered by this language; rather,

9

Patterson disputes the enforceability of any noncompete provision on him because he claims never to have been an employee of ECG and that the provision is otherwise unenforceable.

Patterson had no employment agreement with ECG, though he did serve as ECG's CEO. Kirkcaldy received $15,000 per month under a consulting agreement, which characterized Kirkcaldy as an independent contractor. Doc. 1-2 at 2; Doc. 113 at ¶ 43. Patterson also earned "sweat equity" in ECG for Kirkcaldy by working as CEO for ECG. Doc. 104 at ¶ 4. Patterson himself never received direct compensation from ECG, other than reimbursements for business expenses as would any other ECG employee. Doc. 144 at ¶¶ 47–48.

In May 2016, ECG underwent a restructuring of its Board of Managers' ownership and control. Doc. 144 at ¶ 53. Patterson describes this as Ney forcing Patterson and Larson to relinquish control for fear that Patterson and Larson were gaining ownership interests through sweat equity, thereby diluting Seco and in turn Ney's controlling interest in ECG. Doc. 104 at ¶ 10. In conjunction with that restructuring, on May 23, 2016, ECG entered into an agreement with Kirkcaldy, Soukhaseum (individually, as Kirkcaldy's designee to the Board of Managers), Grass Creek, Larson (individually, as Grass Creek's designee to the Board of Managers), Ney (individually, as Seco's first designee to the Board of Managers), Timothy Mages (individually, as Seco's second designee to the Board of Managers), and James Frauenberg, Jr. (individually, as America Dream's designee to the Board of Managers). Doc. 144 at ¶ 54. Patterson signed the agreement twice—once on behalf of Kirkcaldy, and once as ECG's CEO. Doc. 144 at ¶ 55. Among other things, this agreement established that: "Kirkcaldy, Matt Patterson and Jay Larson will continue to hold any Executive Manager, Independent Manager, officer or similar management positions of the Company and its affiliates." Doc. 104-6 at 2; Doc. 144 at ¶ 58.

10

Patterson agreed that Kirkcaldy would no longer be paid for any consulting services, but Patterson agreed to continue his officer or management positions. Doc. 104-6 at 2; Doc. 144 at ¶ 59.

Weeks later, on June 24, 2016, the ECG Board unanimously adopted a resolution that, among other things, declared "each of Kirkcaldy and Matt Patterson are removed from any governing person, officer or similar management positions of [ECG] . . . that any of them may hold and any other positions as a Company representative." Doc. 104-8 at 1. Patterson apparently still used the designation of CEO of ECG "predominantly in the acquisition transactions" after June of 2016. Doc. 144 at ¶ 61. The parties agree that Kirkcaldy continued to have a member on ECG's Board after June of 2016. Doc. 144 at ¶ 63. Patterson sent a letter to ECG dated January 25, 2017, in which Kirkcaldy resigned its position on ECG's board. Doc. 104-9; Doc. 144 at ¶ 64. ECG wishes to use January 25, 2017 as Patterson's last day as an officer of ECG. See Doc. 130 at ¶¶ 43, 64.

Patterson admits that, starting in late 2016, he "did invest in ECG's competitors," "started purchasing an interest in merchant cash advances made by ECG's competitors," and was "effectively assisting ECG's competitors by providing them with capital." Doc. 144 at ¶ 83. Patterson has an ownership stake in Unbent Media, LLC, and he and his wife loaned a "significant" sum of money to Unbent Media to invest in participations in small business loan and factoring arrangements. Doc. 144 at ¶¶ 84–85. Unbent Media also borrowed $500,000 from Dan Pham to invest in participation agreements with third parties competing with ECG in factoring receivables and loans to small businesses. Doc. 144 at ¶ 86.

In May of 2017, Patterson formed another entity called LHP Income Fund, LLC (LHP), in which Unbent Media is a 10% owner but manages and controls the entity. Doc. 144 at ¶ 87. LHP participates in business loan and factoring agreements. Doc. 144 at ¶ 88. Patterson did not seek

11

permission from ECG to enter into such participation agreements, but informed ECG that he intended to return to the small business lending practice. Doc. 144 at ¶ 90. In addition, Patterson went to work for certain Abernathy entities in the fall of 2016 as a consultant. Doc. 144 at ¶ 91.

In some marketing material for Unbent Media, Patterson touts that he was able to obtain a 40% yield (return on investment) while running ECG. Doc. 1-3 at 2. ECG claims that Patterson misappropriated proprietary and confidential financial information to compete against ECG, including using ECG's rate of return in Unbent Media's marketing. Doc. 1 at ¶ 80. Patterson insists that ECG did not keep its return on investment confidential and indeed chose to file publicly as an attachment to its complaint Unbent Media's pitch material containing the supposedly confidential ECG rate of return. Doc. 104 at ¶ 25. Patterson asserts that gross yield on capital is public knowledge in the merchant cash advance industry. Doc. 104 at ¶ 26.

ECG withheld a distribution typically made to ECG members to cover income tax obligations of ECG's members. Kirkcaldy (the ECG member controlled by Patterson) filed an arbitration action seeking to have ECG pay the distribution and contending that the business judgment rule ought not to apply because ECG intentionally withheld the distribution to Kirkcaldy as a means of pressuring Kirkcaldy to sell its interest in ECG on favorable terms. Kirkcaldy lost that arbitration case. In the present case, Patterson asserts that ECG's claims and litigation strategy are to pressure Kirkcaldy into selling its interest in ECG on discounted terms. ECG seeks partial summary judgment contending that Patterson can make no such assertions, given that Kirkcaldy lost on a similar claim in arbitration.

### D. Facts Relating to Count III

Count III of the complaint alleges "Tortious Interference with Existing and Prospective Business Advantage" and focuses on Patterson's activities concerning Roady's Truck Stops

12

(Roady's). Doc. 1 at ¶¶ 88, 112–118. Although the focus of the tortious interference claim appears to be on Roady's, some of the allegations of tortious interference appear to sweep more broadly. See Doc. 1 at ¶ 115 ("Patterson . . . used and continues to use ECG's confidential and proprietary information to intentionally interfere with ECG's business relationships, including with Roady's"). ECG's relationship with Roady's centers on a referral agreement that ECG and Roady's reached in or around July of 2015, under which Roady's agreed to market ECG's services to Roady's members in exchange for a referral fee for any loan ECG made through Roady's marketing efforts. Doc. 104-20; Doc. 113 at ¶ 47. In May of 2016, ECG in an investor presentation, characterized Roady's as a partner in efforts to obtain truckers and trucking companies as ECG customers for business loans and merchant cash advances, and ECG received some referrals from Roady's. Doc. 113 at ¶ 50. In or around September of 2017, Patterson purchased a stake in Roady's and became its CEO. Doc. 113 at ¶ 48. By the time Patterson did so, the referral agreement between ECG and Roady's was no longer in effect. Doc. 113 at ¶ 49.

## II.    Discussion

### A.  Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary

13

judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007). When there are cross motions for summary judgment, each party's motion must be evaluated independently viewing the facts in the light most favorable to each nonmoving party, to determine if there is any genuine issue of material fact. See Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983).

## B. Question of Governing Law

The parties disagree over which states' laws govern Count I in this case, and Patterson has waffled on which states' law he believes applies to Count II. The parties agree that South Dakota law governs Count III. Regarding Count I for breach of fiduciary duty, ECG claims that Delaware law governs because ECG is a Delaware corporation. Patterson contends that South Dakota law governs the breach of fiduciary duty claim because the principal place of business for ECG was in South Dakota. On Count II for breach of contract/implied contract involving the restrictive covenant, the operating agreements from which the covenant arises has no choice of law provision. ECG asserts that South Dakota law governs. Patterson at one point posited that California law governs Count II because the consulting agreement between Kirkcaldy and ECG specifically states that California law governs it; however, the restrictive covenant is not in the consulting agreement but in iterations of the operating agreement. Patterson now appears to concede that South Dakota law applies to Count II. Doc. 124 at 15, n.8.

## C. Discussion of Causes of Actions

### 1. Breach of Fiduciary Duty Claim

14

Generally, to prove a breach of fiduciary duty, a plaintiff must establish that: (1) the defendant was acting as the plaintiff's fiduciary; that is, the defendant had a fiduciary duty to the plaintiff; (2) the defendant breached a fiduciary duty to the plaintiff; and (3) the plaintiff incurred damages as a result of the breach of fiduciary duty. Chem-Age Indus., Inc. v. Glover, 652 N.W.2d 756, 772 (S.D. 2002); Grand State Prop., Inc. v. Woods, Fuller, Schultz & Smith, P.C., 556 N.W.2d 84, 88 (S.D. 1996); Beard Rsch., Inc. v. Kates, 8 A.3d 573, 601 (Del. Ch. 2010). "The existence of a fiduciary duty and the scope of that duty are questions of law for the court." High Plains Genetics Rsch., Inc. v. J K Mill-Iron Ranch, 535 N.W.2d 839, 842 (S.D. 1995); Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 360 (Del. 1993). Whether a breach of a fiduciary duty occurred, however, typically is a question of fact. Mueller v. Cedar Shore Resort, Inc., 643 N.W.2d 56, 62 (S.D. 2002) (citation omitted); Cede & Co., 634 A.2d at 360.

"Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members." Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 880 (Del. Ch. 2009). To that end, the Delaware Limited Liability Corporation Act provides that the fiduciary duties of a member, manager, or other person that is party to or bound by a limited liability company "may be expanded or restricted or eliminated by provisions in the limited liability company agreement." 6 Del. Code Ann. tit. 6, § 18-1101(c); Zimmerman v. Crothall, 62 A.3d 676, 702 (Del. Ch. 2013); see also SDCL § 47-34A-103; Mahan v. Avera St. Luke's, 621 N.W.2d 150, 154–59 (S.D. 2001) (drawing duties of hospital and its board to medical staff from hospital bylaws). Thus, the parameters of fiduciary duties in the context of a limited liability corporation depend in part on the language of

---

of fiduciary duty claims. Because Delaware law is more fully developed in this realm and likely governs the claims, this Court draws more from Delaware case law.

the limited liability company's governing instrument.  Zimmerman, 62 A.3d at 702; Douzinas v. Am. Bureau of Shipping, Inc., 888 A.2d 1146, 1149–50 (Del. Ch. 2006). "To impose fiduciary standards of conduct as a contractual matter, there is no requirement in Delaware that an LLC agreement use magic words, such as 'entire fairness' or 'fiduciary duties.'" Gatz Props., LLC v. Auriga Cap. Corp., 59 A.3d 1206, 1213 (Del. 2012) (per curiam). If there is no language in an LLC agreement to the contrary, the Delaware Court of Chancery has repeatedly enforced the traditional fiduciary duties that directors and officers would owe in a corporation.[6]  Feeley v. NHAOCG, LLC, 62 A.3d 649, 660 n.1 (Del. Ch. 2012) (collecting cases); see Del. Code Ann. tit. 6, § 18–1104.

Both corporate officers and corporate directors owe the same fiduciary duties of care and loyalty. Gantler v. Stephens, 965 A.2d 695, 708–09 (Del. 2009). "An officer or director of a corporation has a fiduciary duty to act in a manner that he reasonably believes is in [the corporation's] best interests." Lindskov v. Lindskov, 800 N.W.2d 715, 719 (S.D. 2011).  An officer or director must "exercise the 'utmost good faith and fair dealing' with the company." Id. (quoting Mueller, 643 N.W.2d at 66); see Cede & Co., 634 A.2d at 360 (directors have "an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders"). However, unlike directors, "[o]fficers also are fiduciaries in their capacities as agents who report to the board of directors." Lebanon Cnty. Emps. Ret. Fund v. Amerisourcebergen Corp., No. 2019-0527-JTL, 2020 WL 132752, at *21 (Del. Ch. Jan. 13, 2020).

---

[6] Because ECG is a manager-managed entity, this Court may look to corporate law principles by analogy when determining whether and to what extent default fiduciary duties are owed. Obeid v. Hogan, No. 11900–VCL, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016) ("If the drafters [of an LLC agreement] have opted for a manager-managed entity, created a board of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law.").

"Within this relationship, officers have a duty to comply with the board's directives." Id. (citing Restatement (Third) of Agency § 8.09 (Am. Law Inst. 2006)).  Put another way, an officer "may not act in a manner contrary to the express desires of the board of directors." Id. (quoting In re Walt Disney Co. Derivative Litig., 907 A.2d 693, 775 n.570 (Del. Ch. 2005), aff'd, 906 A.2d 27 (Del. 2006)).

Patterson's defense of the business judgment rule (sometimes called the business judgment standard) invokes "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company."[7] Gantler, 965 A.2d at 705–06 (quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)); see also Minn. Invco of RSA No. 7, Inc. v. Midwest Wireless Holdings LLC, 903 A.2d 786, 797 (Del. Ch. 2006) (applying the traditional corporate definition of the business judgment rule to a breach of duty of care claim against LLC managers); Sutherland v. Sutherland, 348 S.W.3d 84, 89–90 (Mo. Ct. App. 2011) (explaining that officers of a limited liability company are not liable for business decisions that they believe in good faith are in the company's best interests).  In brief:

> The rule operates as both a procedural guide for litigants and a substantive rule of law.  As a rule of evidence, it creates a "presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company." Aronson v. Lewis, Del. Supr., 473 A.2d 805, 812 (1984). The presumption initially attaches to a director-approved transaction within a board's conferred or apparent authority in the absence of any evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment."

---

[7] The Supreme Court of South Dakota has no case elaborating on the business judgment rule. "[W]here there is no case directly on point by a state's highest court," this Court must "look to 'relevant state precedent, analogous decisions, considered dicta, and any other reliable data' to determine how the Supreme Court of [South Dakota] would construe [South Dakota] law." In re W. Iowa Limestone, Inc., 538 F.3d 858, 866 (8th Cir. 2008) (quoting HOK Sport, Inc. v. FC Des Moines, L.C., 495 F.3d 927, 935 (8th Cir. 2007)).  This Court predicts that the Supreme Court of South Dakota would adopt and follow this common formulation of the business judgment rule.

Grobow v. Perot, Del. Supr., 539 A.2d 180, 187 (1988).  See Allaun v. Consolidated
Oil Co., Del.Ch., [16 Del.Ch. 318,] 147 A. 257, 261 (1929).

Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 64 (Del. 1989).  The business
judgment rule creates "a powerful presumption" in favor of actions taken by a loyal and informed
and authorized corporate decision maker,[8] such as a board of directors, as long as it can be
"attributed to any rational business purpose."  Cede & Co., 634 A.2d at 361 (quoting Sinclair Oil
Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971)).  The business judgment rule, however, does not
preclude interfering with decisions of corporate officials that reflect fraud, illegal conduct, an ultra
vires act, or irrational business judgment.  Sutherland, 348 S.W.3d at 90; see also Melzer v. CNET
Networks, Inc., 934 A.2d 912, 914 (Del. Ch. 2007) (finding that an act in violation of the corporate
charter is an ultra vires act, and therefore, "is not the product of valid business judgment").
Relatedly, "a cognizable claim of disloyalty rebuts the business judgment presumption."  Gantler,
965 A.2d at 708. Application of the business judgment rule depends on the facts and is focused on
fairness in the sense of analyzing whether the transaction involved a "fair price and fair dealings."
Zimmerman, 62 A.3d at 708; see also Cede & Co., 634 A.2d at 361.

The operating agreements in place during the time when Patterson was the CEO of ECG
required Board approval for transactions exceeding $50,000.  Both the payment to Pham upon
termination of certain participation agreements and the waiver of the management fee to the

---

[8] There is an open question about when the business judgment rule applies to corporate officers
under Delaware law. Palmer v. Reali, 211 F. Supp. 3d 655, 666 n.8 (Del. 2016) (declining to apply
business judgment rule to officers because defendants failed to cite any cases in which a Delaware
court has held that the business judgment rule applies to corporate officers); Chen v. Howard-
Anderson, 87 A.3d 648, 666 n.2 (Del. Ch. 2014) (noting that the Supreme Court of Delaware has
not addressed whether the business judgment rule applies to officers and that a debate exists among
legal scholars as to whether it should; see In re Tower Air, Inc., 416 F.3d 229 (3d Cir. 2005)
(applying the business judgment rule to directors and officers alike). However, ECG does not argue
that the business judgment rule does not apply to its officers.

Abernathy entities involved transactions greater than $50,000. ECG has noted and flagged a series of additional transactions exceeding $50,000, including some for marketing, corporate coaching, and Minnesota Vikings season tickets. Patterson's defense of the business judgment rule includes assertions that there were sound business reasons for ECG to make the termination payment to Pham and to waive the marketing fee for the Abernathy entities, as well as to engage a marketing firm, contract for a phone system for its call center, and seek executive coaching. ECG disputes Patterson's explanations and counters that his actions were ultra vires because he had no authority apart from the Board to engage in transactions binding ECG that exceeded $50,000. This Court will address each transaction in turn.

Patterson argues that his decision to pay Pham $123,000 under the participation termination agreements is shielded from court review by the business judgment rule. Specifically, he argues that there were sound business reasons for ECG to make the payment to Pham. Alternatively, he argues that ECG suffered no damages from this decision; rather, ECG was benefited by the decision because it prompted Pham to reinvest $1.5 million with ECG. Even if the business judgment rule applies to officers, the business judgment rule does not authorize officers to act directly contrary to the operating agreement, regardless of the officers' justification. Melzer, 934 A.2d at 914. However, a genuine dispute of material fact remains on whether Patterson's decision to pay Pham $123,000 caused any damage to ECG.

As to the Abernathy entities, Patterson contends that he was not responsible for collecting the three percent fee from the Abernathy entities and that he was not even aware that ECG had failed to collect the fee. Alternatively, Patterson argues that his actions did not damage ECG because the money the Abernathy entities owed to ECG was offset by the money ECG owed back to those entities. ECG counters that Patterson cultivated ECG's relationship with the Abernathy

entities and negotiated the participation agreement with the Abernathy entities, and therefore, Patterson as ECG's CEO should have monitored whether the Abernathy entities were fulfilling their end of the agreement.  Further, ECG emphasizes that the operating agreement required Patterson to obtain Board approval for any expenditures exceeding $50,000, and here Patterson purportedly caused ECG to waive approximately $265,000 in fees.  As an officer of ECG, Patterson owed ECG fiduciary duties including a duty of care, a duty of loyalty, and compliance with its operating agreement.  Whether Patterson breached any of those duties in dealing with the Abernathy entities or if ECG incurred any damages remain genuine disputes of material fact such that summary judgment is denied.  In sum, this Court concludes that there are sufficient issues of material fact between ECG and Patterson that neither ECG nor Patterson are entitled to summary judgment on the breach of fiduciary duty claims relating to the Pham or Abernathy entities claims.

ECG's complaint also makes breach of fiduciary duty claims relating to Patterson's alleged formation of a participation fund to compete against ECG, alleged misuse of confidential information of ECG to benefit Patterson's own companies, and alleged use of his position with ECG to further his personal interests at ECG's expense. Doc. 1 at ¶¶ 95, 99.  ECG does not seek summary judgment on these aspects of the breach of fiduciary duty claim, but instead seeks partial summary judgment on other ECG transactions during Patterson's tenure as CEO where allegedly without Board approval expenditures exceeding $50,000 were made.  This Court declines to grant ECG summary judgment on these assertions of breach of fiduciary duty for two reasons.  First, ECG did not expressly plead these claims in its complaint, Doc. 1, although Patterson barely mentions this issue in opposing summary judgment, Doc. 102 at 21.  Perhaps these claims are encompassed within the realm of transactions to further Patterson's personal interests at ECG's expenses. See Doc. 1 at ¶ 95. Second, questions of fact exist on whether some of these transactions

did indeed exceed $50,000 and were attributable to Patterson acting without Board approval or may have been later ratified in some manner by the Board. See Docs. 145, 145-1, 145-2, 145-3, 145-4.

Patterson seeks summary judgment on the entirety of ECG's breach of fiduciary duty claim. The facts and issues concerning Patterson's use of his other companies to participate in loans by competitors of ECG and whether he used confidential information of ECG are convoluted and contested, as well as interrelated with ECG's claims in Count II regarding the restrictive covenant. While Patterson does admit to competing with ECG toward the end of 2016, summary judgment on those claims is improper because there is at least a genuine dispute of material fact about whether ECG suffered any damages. At this point, the briefing leaves it unclear whether ECG presently pursues those claims as part of Count I or Count II or both. Patterson owed no fiduciary duty as a matter of law to ECG as an officer after his termination as CEO on June 24, 2016, nor arguably as a director after January 25, 2017, when Kirkcaldy no longer had a position on the Board. Whether those claims for unfair competition reach a jury under a breach of fiduciary duty theory is a decision that this Court will make at trial after hearing testimony and receiving exhibits.

### 2. Breach of Contract/Implied Contract

Count II of ECG's complaint alleges breach of contract/implied contract relating to Section 5.04 of the Second and Third Amended Operating Agreements. Section 5.04 is essentially a broad noncompete agreement. Specifically, it prohibits a "Restricted Member" from engaging in certain activities for a period of one year "after his or its Separation Date." Doc. 1-5 at § 5.04(a).

ECG maintains that South Dakota law governs the noncompete agreement as South Dakota is ECG's principal place of business, while Patterson posited that California law governs the

noncompete agreement because the consulting agreement between ECG and Kirkcaldy chose California law to govern. Doc. 1-2 at 6. Patterson later acknowledged that South Dakota law governed. To avoid any later debate over which states' law governs Count II, this Court will undertake a conflict of law analysis here. Patterson's initial argument about California law governing would be compelling if the restrictive covenant were in the consulting agreement, but it is not. The restrictive covenant containing the noncompete provision is in the operating agreements, which are silent as to which states' law governs, although they reference the formation of the company under Delaware law and the principal place of business being South Dakota. See Doc. 1-4. California law is somewhat more hostile to enforcement of noncompete agreements than is South Dakota law. [9] Cal. Bus. & Prof. Code § 16600 ("Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."); Kelton v. Stravinski, 41 Cal. Rptr. 3d 877, 881 (Cal. Ct. App. 2006) ("[T]he general rule is that covenants not to compete are void."). Accordingly, the choice of law (unlike with the breach of fiduciary duty claim) does matter to the enforceability of the restrictive covenant.

South Dakota follows the Restatement (Second) of Conflict of Laws to resolve choice of law questions. Stockmen's Livestock Exch., 520 N.W.2d at 257. Under Restatement (Second) of Conflict of Laws § 187, courts generally defer to the parties' choice of law in a contract unless the chosen state has no substantial relationship and there is no other reasonable basis for the choice.

---

[9] There are statutory exceptions to the general rule against noncompete agreements in both California and South Dakota. California's exceptions happen to be narrower. In California, a noncompete is upheld only in the following circumstances: (1) a person sells the goodwill of his or her business, see Cal. Bus. & Prof. § 16601; or (2) a member terminates his or her interest in a partnership or LLC, see Cal. Bus. & Prof. §§ 16602, 16602.5. Because Kirkcaldy (and by extension Patterson) has not terminated its interest in ECG, neither exception applies.

There are no choice of law provisions in the operating agreements where the restrictive covenant at issue is found.

Section 188 of the Restatement (Second) of Conflict of Laws applies when the parties have no contractual choice of law provision:

> (1)    The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2)    In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.
>
> (3)    If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

Restatement (Second) of Conflict of Laws § 188 (Am. Law Inst. 1971). The reference to "§ 6" within Section 188 is to the general choice of law provision in Section 6, which was adopted in Burhenn v. Dennis Supply Co., 685 N.W.2d 778 (S.D. 2004). Section 6 provides:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

     (a)  the needs of the interstate and international systems,

     (b)  the relevant policies of the forum,

     (c)  the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

     (d)  the protection of justified expectations,

     (e)  the basic policies underlying the particular field of law,

     (f)  certainty, predictability and uniformity of result, and

     (g)  ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (Am. Law Inst. 1971).

There is no good reason why California law would or should govern a noncompete agreement contained within the operating agreements of a Delaware corporation with its principal place of business in South Dakota. The primary place of performance is in South Dakota, not California; the location of ECG was South Dakota, not California; and the corporation governed by the operating agreement was in South Dakota, not California. This Court is left uncertain as to the place of contracting or negotiation of the contract, but all other factors of § 188 favor applying South Dakota law, and not California law, to the terms of the operating agreements. As far as the factors in § 6, South Dakota has a much greater interest in the operating agreements and restrictive covenants of ECG than does California; the parties' justified expectations in enforceability of the restrictive covenant favors applying South Dakota law; and predictability and uniformity of results is achieved by applying South Dakota law to all parties bound by the restrictive covenant rather than California law to just Kirkcaldy and Patterson. South Dakota law governs the various issues concerning the breach of contract/implied contract claim in ECG's complaint.

Under South Dakota law, contracts which are in restraint of trade are void as a matter of public policy.  SDCL § 53-9-8.  However, one statutory exception is found at SDCL § 53-9-11, which states:

> An employee may agree with an employer at the time of employment or at any time during his employment not to engage directly or indirectly in the same business or profession as that of his employer for any period not exceeding two years from the date of termination of the agreement and not to solicit existing customers of the employer within a specified county, first or second class municipality, or other specified area for any period not exceeding two years from the date of termination of the agreement, if the employer continues to carry on in a like business therein.

SDCL § 53-9-11.  The Supreme Court of South Dakota has found that the "clear import" of this statute is "to except noncompetition agreements from the general proscriptions against restraint on trade, as long as the noncompetition agreements comport with the statutory language." Am. Rim & Brake, Inc. v. Zoellner, 382 N.W.2d 421, 424 (S.D. 1986).

An initial question in this case is whether Patterson was ever an "employee" of ECG such that the noncompete agreement is enforceable under SDCL § 53-9-11. Patterson was a founder of ECG and served as its CEO for several years.  However, Patterson contends that he was an independent contractor performing service under a servicing contract between ECG and Kirkcaldy that in turn characterized Kirkcaldy as an independent contractor. Doc. 1-2. During two hearings, Patterson's counsel has acknowledged that Patterson is within the terms of the restrictive covenant as the beneficial owner of Kirkcaldy.  Doc. 150 at 38.  Thus, the issue is not whether the noncompete agreement applies to Patterson; rather, the issue is whether the agreement is enforceable at all under South Dakota law.

The seminal case in South Dakota distinguishing between an employee and an independent contractor is <u>Egemo v. Flores</u>, 470 N.W.2d 817 (S.D. 1991).[10]  South Dakota looks at two primary factors to determine whether an individual is an independent contractor or employee:  (1) whether the individual is free from control or direction over the performance of the services, both under contract of service and in fact; and (2) whether the individual is customarily engaged in an independently established trade, occupation, profession or business.  <u>Id.</u> at 821 (quoting <u>Appeal of Hendrickson's Healthcare Serv.</u>, 462 N.W.2d 655, 659 (S.D. 1990)).  The first factor is called "right of control," and the second factor is called "independently established trade."  <u>Egemo</u>, 470 N.W.2d at 821–22.  "[T]he ultimate determination of whether an individual is an employee or an independent contractor is a mixed question of law and fact."  <u>Id.</u> at 820.

"In evaluating the 'right of control test,' important considerations include direct evidence of the right of control, the method of payment, furnishing major items of equipment, and the right to terminate the employment relationship at will and without liability."  <u>Id.</u> at 821 (citation omitted).  Patterson certainly had quite a bit of independence initially working as the CEO of ECG, a small business that he (through Kirkcaldy) and Larson launched.  Yet Patterson had to answer to the Board of ECG while its CEO.  The method of payment—$15,000 per month under a consulting agreement to Kirkcaldy—connotes an independent contractor, but the award of "sweat equity" to Kirkcaldy based on Patterson's work is akin to a stock-option agreement in an employment arrangement.  The consulting agreement between ECG and Kirkcaldy was between the company and one of its members, with Patterson presumably providing the "consulting" by being CEO.  ECG appears to have furnished the major items of equipment, and indeed compensated and

---

[10] When it comes to distinguishing between an employee and independent contractor, California law and South Dakota law do not appear to differ much.  <u>See</u> <u>S.G. Borello & Sons, Inc. v. Dep't of Indus. Rel.</u>, 769 P.2d 399, 403–07 (Cal. 1989).

reimbursed Patterson for expenses as if he were an employee. ECG maintained the right to terminate Patterson and indeed did so in June of 2016, one month after ECG terminated the consulting agreement with Kirkcaldy. That is, Patterson remained CEO of ECG for an additional month after the consulting agreement between ECG and Kirkcaldy was terminated in May of 2016.

The major considerations in the "independently established trade" prong of the test are that the individual's occupation "be independently established and that he be customarily engaged in it." Hendrickson's Health Care Serv., 462 N.W.2d at 659. This "calls for an enterprise created and existing separate and apart from the relationship with the particular employer; an enterprise that will survive the termination of that relationship." Egemo, 470 N.W.2d at 822 (quoting Hendrickson's Health Care Serv., 462 N.W.2d at 659). An independent contractor has a "proprietary interest in the enterprise to the extent that [he] can operate it without hinderance." Id. (quoting Hendrickson's Health Care Serv., 462 N.W.2d at 659). That is, whether the individual "is employed is solely a function of market forces and the demand for [his] skills, not the response of [his] master to similar economic realities." Id. (quoting Hendrickson's Health Care Serv., 462 N.W.2d at 659). Here, there is no evidence Kirkcaldy existed for any other purpose than to be a member of ECG and to enter into a consulting agreement with ECG for Patterson essentially to funnel his compensation as CEO to Kirkcaldy. Patterson at the time had no other job besides CEO of ECG, and Kirkcaldy had no other client besides ECG.

Patterson's motivation for establishing the Kirkcaldy-ECG arrangement is relevant to the analysis of whether he was in reality an employee of ECG. When Patterson formed Kirkcaldy and in turn ECG in 2011, Patterson was subject to a stipulated final judgment and order in the United States District Court for the Northern District of California under which he agreed to pay $800,000 personally to the United States and agreed to certain restrictions on his or any company he owned

28

"advertising, promoting, offering for sale, or sale of any Payment Card, loan, financial product or service, or any other product or service . . . ." Doc. 1-1. Thus, Patterson was motivated to create a corporate structure to separate himself from apparent direct involvement in marketing loans. So Patterson started ECG not personally as Larson did, but through Kirkcaldy. To further distance himself on paper, Patterson had Kirkcaldy be 100 percent owned by Grangemouth Group, LLC, and had his personal friend Soukhaseum as the sole manager of Kirkcaldy and Grangemouth Group, LLC, even though the entities existed for the benefit of Patterson. Doc. 1 at ¶¶ 7–8; Doc. 11 at ¶ 1. Grangemouth Group, LLC in turn is a manager-managed limited liability company whose sole member is PENSCO Trust Company FBO Matt Patterson. Doc. 1 at ¶ 9; Doc. 11 at ¶ 1. Whether Patterson should or should not have been engaged in merchant lending through ECG is beside the point, and this history and corporate structure may well be more unfairly prejudicial then probative at trial. At bottom, Patterson was the CEO of ECG, and the complicated corporate structuring and the rather indirect compensation through ECG's consulting agreement with Kirkcaldy and "sweat equity" for Patterson's work derived in no small part from Patterson's desire to keep himself, at least on paper, as insulated as possible from being accused of violating the stipulated final judgment and order in the Northern District of California. Looking through that arrangement, Patterson's work as CEO of a merchant lending business he himself founded and financed, Doc. 104 at ¶¶ 3–4, is not independent contractor work.

The parties then dispute Patterson's separation date from which the one-year noncompete time would run. Patterson contends that his separation date was June 24, 2016. On May 23, 2016, ECG terminated its consulting agreement with Kirkcaldy. Doc. 105-6. However, notwithstanding the termination of the consulting agreement, Kirkcaldy continued as Executive Manager and Patterson continued as CEO thereafter without further compensation. Doc. 105-6 at 2. Then on

29

June 24, 2016, Kirkaldy was formally removed as Executive Manager and Patterson was formally terminated from any "officer or similar management positions" with ECG.  Doc. 104-8 at 1.

ECG, however, contends that Patterson continued some employment status with ECG until January 25, 2017, when he gave notice that Kirkaldy was removing itself from the Board.  ECG points to the Fourth Amended Operating Agreement, which changed the language in the restrictive covenant.  Neither Kirkaldy nor Patterson signed the Fourth Amended Operating Agreement. ECG cannot unilaterally, without the assent of Kirkaldy (acting for and through Patterson), change the terms of the restrictive covenant that governed Kirkaldy/Patterson.  Under language of the restrictive covenant as it existed in the last agreement to which Kirkaldy (and in turn Patterson) assented, the noncompete extended for a one-year period following Patterson's termination, which was June 24, 2016.

This Court recognizes that on some occasions after June of 2016, Patterson still referred to himself as the CEO of ECG when seeking business opportunities for ECG.  The fact that Patterson used that designation, however, does not alter the fact that he no longer held that position or any other position with ECG, besides Kirkaldy being a member of ECG and having a board position through January 25, 2017.  To the extent that ECG seeks to enforce the noncompete covenant beyond June 24, 2017, Patterson's motion for summary judgment on Count II is granted. Patterson's motion for summary judgment is otherwise denied.  This Court concludes that there are genuine issues of material fact when the facts are viewed in the light most favorable to Patterson that preclude entry of summary judgment for ECG on this claim.

### 3. Count III – Tortious Interference with Business Relationship

30

Count III of ECG's complaint, as summarized above, claims tortious interference with business expectancy, primarily focused on a relationship that ECG had with Roady's. Both parties agree that South Dakota law governs this tort claim.

Under South Dakota state law, the essential elements for tortious interference with business relations or expectancy are: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted. Hohn v. Spurgeon, 513 F.3d 827, 829 (8th Cir. 2008) (applying South Dakota law); Mueller, 643 N.W.2d at 68. To make out a claim of tortious interference, "there must be a 'triangle'—a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the plaintiff and the third party." Hayes v. N. Hills Gen. Hosp., 590 N.W.2d 243, 248 (S.D. 1999) (cleaned up and citation omitted).

Here, there arguably is such a triangle consisting of ECG, Patterson, and Roady's. However, Patterson argues that: (1) ECG's business relationship with Roady's through the July of 2015 referral agreement ended before September of 2017; and (2) Patterson's interaction at issue with Roady's began in September of 2017 when he bought out a founder of Roady's and became its chief executive officer. Doc. 102 at 23. ECG did not contest these assertions and its response brief does not address Count III at all. Doc. 117.

The Supreme Court of South Dakota framed the tortious interference claim as protecting both business relationships and business expectancies. See Hayes, 590 N.W.2d at 247–48 (recognizing that "valid business relationships and expectancies are entitled to protection from unjustified interference" (quoting Landstrom v. Shaver, 561 N.W.2d 1, 18 (S.D. 1997))). To

31

constitute a valid business expectancy, the plaintiff must have an expectancy to receive an economic advantage or pecuniary benefit from a third party. Id. at 248 ("The tort also protects a party's interest in stable economic relationships" and "[f]or this tort to occur…it need not be intended that there be a contract."); Landstrom, 561 N.W.2d at 16 ("[T]o establish a 'valid business relationship or expectancy,' there ha[s] to be a showing of a . . . business relationship between the plaintiff and an identifiable third party." (citation omitted)). Further, it must be reasonably probable that the business expectancy would have come to fruition but for the defendant's conduct. See Hayes, 590 N.W.2d at 250; see also Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assoc., Architects & Planners, Inc., 821 N.W.2d 1, 3 (Mich. 2012) (stating that to make out a claim for tortious interference with a business relationship or expectancy, "the expectancy must be a reasonable likelihood or probability, not mere wishful thinking"); Stehno v. Sprint Spectrum, L.P., 186 S.W.3d 247, 250 (Mo. 2006) ("The valid business expectancy requirement involves more than a mere subjective expectancy—it must be a *reasonable* expectancy . . . .").

Although the existence of a valid business relationship or expectancy can be fact-dependent and a question of fact, it appears undisputed that ECG and Roady's no longer had a business relationship or expectancy at the time Patterson acquired an interest in Roady's and became its CEO. Indeed, the lack of any opposition from ECG to the motion for summary judgment on Count III can be deemed a waiver of the claim justifying entry of summary judgment. Satcher v. Univ. of Ark. at Pine Bluff Bd. of Tr., 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."). Moreover, ECG has not shown the facts to meet the second and third elements of tortious interference concerning Patterson's activities in September of 2017 with Roady's; there is no evidence that Patterson had knowledge of ECG's business expectancy with Roady's in September of 2017 or that Patterson intentionally

32

and unjustifiably interfered with any such expectancy.  See Sancom, Inc. v. Quest Commc'ns Corp., 643 F. Supp. 2d 1117, 1129 (applying South Dakota law); St. Onge Livestock Co., Ltd. v. Curtis, 650 N.W.2d 537, 541–42 (S.D. 2002).  ECG appeared not to have had any business expectancy with Roady's in September of 2017.  Summary judgment for Patterson enters on Count III at least to the extent that the claim relates to conduct involving Roady's in September of 2017 and thereafter.

### D.  Patterson's Defense Concerning ECG's Motive

A portion of the motion for partial summary judgment and brief of ECG seeks summary judgment on Patterson's theory of defense that ECG is using this lawsuit to "squeeze out and cram down" a plan to force him to sell Kirkcaldy's interest in ECG at a discounted price.  ECG argues that the issue was fully and fairly litigated in arbitration that took place between Kirkcaldy and ECG over a tax distribution dispute.  The arbitrator's Final Award stated that "the evidence fails to establish any 'scheme' or inappropriate acts of the Respondent members to seize control of ECG and impose a financial squeeze on Kirkcaldy."  Doc. 115-20 at 6.  ECG invokes res judicata and collateral estoppel as grounds to bar any assertion by Patterson that ECG is trying to squeeze him (through Kirkcaldy) out of ownership and to cram down terms to liquidate Kirkcaldy's ownership in ECG.

Patterson thinks that neither doctrine applies to his argument because none of the findings of the arbitrator directly addressed the "squeeze out" and "cram down" arguments and because those issues were not "actually litigated" or "necessary to the outcome" of the arbitrator's findings.  Rather, Patterson argues that the arbitrator's finding merely was that ECG's decision not to make the 2018 tax distribution of $214,000 to Kirkcaldy was a good faith business judgment protected by the business judgment rule.  Doc. 143 at 8–11.

33

The doctrine of res judicata serves as claim preclusion to prevent re-litigation of a previously-determined cause of action in an earlier suit. Black Hills Jewelry Mfg. v. Felco Jewel Indus., Inc., 336 N.W.2d 153, 157 (S.D. 1983).  The earlier court (or tribunal) must have had jurisdiction and the decision must be final and not reversed. Id. Whether the causes of action are the same depends on if the wrong sought to be redressed is the same in both actions. Id. The doctrine of res judicata applies with equal force to affirmative defenses. Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc., 140 S. Ct. 1589, 1595 (2020); Brown v. Felsen, 442 U.S. 127, 131 (1979).  The doctrine of res judicata extends to those who were in privity to the parties in the prior litigation. Schell v. Walker, 305 N.W.2d 920, 922 (S.D. 1981). Although Patterson and Kirkcaldy are in privity to one another, no party makes any claims in this lawsuit about ECG's decision not to make a 2018 tax distribution payment to its members, so res judicata does not apply here.

The doctrine of collateral estoppel bars the re-litigation of underlying factual matters between the same parties. South Dakota law on collateral estoppel turns on the application of a four-part test: (1) whether the issue decided in the prior adjudication was identical to the one presented in the action in question; (2) whether there is a final judgment on the merits; (3) whether the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) whether the party against whom the plea is asserted had a full and fair opportunity to litigate the issue in the prior adjudication. Grand State Prop., Inc., 556 N.W.2d at 87; Black Hills Novelty Co., Inc. v. S.D. Commc'n on Gaming, 520 N.W.2d 70, 73 (S.D. 1994). ECG has a better argument for applying collateral estoppel, but Patterson's argument about ECG's motives extends to conduct apart from and beyond not making the 2018 tax distribution.

34

Ultimately, ECG's motives in filing the lawsuit are not an affirmative defense to either a breach of fiduciary duty or breach of a covenant not to compete claim. Patterson does not even plead this as an affirmative defense in his answer. Doc. 11. The motive of ECG was more relevant in the arbitration to whether the business judgment rule protected ECG's decision not to make the tax distribution. Because the motives of ECG are not an affirmative defense to the claims, the question becomes whether it is relevant to any issue being tried that Patterson believes ECG is attempting to squeeze out him and Kirkcaldy and to cram down terms for Kirkcaldy to sell its ownership in ECG. Rule 408 of the Federal Rules of Evidence preclude settlement discussions and offers from being admitted at trial, and this Court is not certain whether negotiations over the price to be paid Kirkcaldy for its ownership stake in ECG has been part of any discussion between the parties for resolution of this case. This Court prefers to deal with this issue—the admissibility, if any, of evidence of ECG's alleged true motives in bringing the lawsuit—at the pretrial conference when ruling on motions in limine. To the extent that Patterson might believe that ECG's motives somehow are an affirmative defense, summary judgment then would be proper.

**III.    Conclusion**

For the reasons set forth in this Opinion and Order, it is hereby

ORDERED that Patterson's motion for summary judgment is denied in part and granted only on Count III relating to ECG's claim of tortious interference with its business relationship with Roady's and to the extent that ECG seeks to enforce the noncompete covenant beyond June 24, 2017. It is further

ORDERED that ECG's motion for partial summary judgment is denied, except summary judgment for ECG is proper to the extent Patterson now raises ECG's motives as an affirmative defense. It is finally

ORDERED that the parties schedule with this Court a brief telephonic hearing to discuss setting a jury trial date and certain pre-trial filing deadlines.

DATED this 22nd day of January, 2021.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE